UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERTO BROWNE and JADE N. PARKER,

Plaintiffs,

- against -

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION,

Defendant.

**OPINION & ORDER**

21-CV-05240 (PMH)

PHILIP M. HALPERN, United States District Judge:

Roberto Browne ("Browne") and Jade N. Parker ("Parker" and together, "Plaintiffs") commenced this action on June 13, 2021 against the State of New York and the New York State Department of Corrections and Community Supervision ("DOCCS" or "Defendant").[1] (Doc. 1, "Compl."). Plaintiffs press one claim for relief for hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). (*Id.*). Defendant filed an Answer to the Complaint on August 27, 2022 (Doc. 17), and the parties engaged in discovery pursuant to the Civil Case Discovery Plan and Scheduling Order (Doc. 40). Discovery concluded on November 30, 2022. (Doc. 40).

Pending before the Court is Defendant's motion for summary judgment made pursuant to Federal Rule of Civil Procedure 56. (Doc. 60). Defendant filed, pursuant to the briefing schedule set by the Court, its motion for summary judgment on July 7, 2023. (Doc. 50, "56.1 Stmt."; Doc. 61, "Def. Br."; Doc. 62, "Yoon Decl."; Doc. 63, "Barometre Decl."; Doc. 64, "Firester Decl."; Doc. 65, "Germano Decl."; Doc. 72, "Flessa Decl."). Plaintiffs filed their opposition papers (Doc.

[1] Plaintiffs filed a Notice of Voluntary Dismissal as to the State of New York on August 23, 2021 which dismissed their claims against the State of New York with prejudice. (Doc. 16).

69, "Pl. Br."; Doc. 70, "Parker Decl."; Doc. 71, "Browne Decl."; Doc. 75, "Sussman Decl."), and the motion was fully briefed with the filing of Defendant's reply. (Doc. 73, "Reply").

For the reasons set forth below, Defendant's motion for summary judgment is GRANTED.

**BACKGROUND**

The Court recites the facts herein only to the extent necessary to adjudicate the motion for summary judgment and draws them from the pleadings, Defendant's Rule 56.1 Statement and Plaintiffs' responses thereto, and the admissible evidence proffered by the parties. Unless otherwise indicated, the facts cited herein are undisputed.

Browne and Parker work as correction officers at Otisville Correctional Facility ("Otisville"). (56.1 Stmt. ¶ 1). Parker is an African American woman who started working at Otisville in October 2016 and Browne is a black Latino man who started working in Otisville in June 2019. (*Id.* ¶¶ 1-2). Parker currently works the "Tour 3" shift, which is the shift that Parker specifically requested. (*Id.* ¶ 2). Browne currently works the school building and gym post, which is the post that Browne specifically requested. (*Id.* ¶ 3).

I. Harassing Conduct

Parker received comments from other correction officers that she preferred associating with incarcerated individuals after she posted a photo on her Facebook page of herself with a friend who was an incarcerated individual. (Yoon Decl., Ex. B, "Parker Dep. Tr." at 57:9-62:12). Parker did not report these comments to her supervisors. (*Id.* at 62:10-12). When Parker was working the inmate bus post, other correction officers would stop her car and check if she was bringing any contraband into the facility. (*Id.* at 79:19-88:21). Parker believed that the correction officers would check her car for contraband because she was friends with another correction officer who got in trouble for bringing contraband into the facility. (*Id.* at 80:14-81:7). Parker was asked to testify at a disciplinary hearing regarding an incarcerated individual that was written up for not carrying a

bus pass and testified that she was not present for the incident in question. (*Id.* at 62:21-66:16). As a result of Parker's testimony at the disciplinary hearing, Correction Officer Lear told other correction officers that Parker was a "rat" and did not "stick up for the blues." (*Id.* at 66:3-16). Sometime in October 2019, Parker reported that the word "rat" was written on her timecard slot. (*Id.* at 107:24-109:11).

In October 2019, Correction Officer Reed referred to Browne as a "scumbag" and implied that Browne was involved with the prosecution of correction officers at another DOCCS facility. (Yoon Decl., Ex. A, "Browne Dep. Tr." at 59:24-61:24). Around that same time, an unidentified individual cut a valve stem on Browne's car while it was parked at Otisville. (*Id.* at 138:12-142:21). Browne received prank calls from unidentified individuals calling him a "rat bitch." (*Id.* at 146:25-147:22). Unidentified individuals also placed blank transfer request forms in his mailbox, encouraging him to request a transfer and leave Otisville. (*Id.* at 98:18-99:19). An unidentified individual posted three poems in the room where the correction officers clocked in and out sometime in November 2019. (*Id.* at 81:12-82:20). These poems were titled, "The Prince of Otisville", "Tattooed Man Decides to Stay", and "Tattooed Man Comes up with a Plan." (Sussman Decl., Ex. 26). The three poems refer to a "tattooed" Otisville correction officer but do not reference the race, ethnicity, or national origin of any correction officer. (*Id.*). Neither Browne nor Parker is mentioned in any of the poems. (56.1 Stmt. ¶ 50). Browne does not have any tattoos. (*Id.* ¶ 48). Browne and Parker believed that the three poems were about a "Sergeant Rosado" or a "Sergeant Rosario." (Browne Dep. Tr. at 93:2-21; Parker Dep. Tr. at 152:5-22).

Both Browne and Parker had their timecards go missing on more than one occasion in October 2019. (Browne Dep. Tr. at 124:18- 125:21; Parker Dep. Tr. at 115:23-116:23). Correction Officer Spencer, a Caucasian male, also had problems with the tampering of his timecards. (56.1

Stmt. ¶ 7). Parker and Browne reported their timecards going missing, and subsequently Superintendent Barometre issued a memorandum titled "Conduct Within the Workplace" and ordered the staff supervisors to read out the memorandum and discuss it in detail at the beginning of the daily lineup meeting with the correction officers. (*Id.* ¶ 32). Staff supervisors read the memorandum and ordered the correction officers to cease any harassment, stating it would not be tolerated and to avoid misplacing timecards. (*Id.* ¶ 35). The correction officers were then instructed to stamp their timecards and bring them back to the sergeant's office instead of leaving them in the timecard slots. (*Id.* ¶ 6). After the correction officers placed their timecards in the sergeant's office, the timecards stopped going missing. (*Id.*).

Housing Units 118-1 and 118-2 were used to quarantine incarcerated individuals who were exposed to COVID-19. (*Id.* ¶ 8). These housing units were also used to house certain incarcerated individuals unrelated to the COVID-19 quarantine. (*Id.*). From February 2020 to February 2021, Browne was assigned to Housing Units 118-1 or 118-2 on four occasions while they were being used to quarantine individuals exposed to COVID-19, and Parker was assigned to those units on twelve occasions while they were being used to quarantine individuals exposed to COVID-19. (*Id.* ¶¶ 10-11). From February 2020 to February 2021, many other correction officers were assigned to Housing Units 118-1 and 118-2 multiple times, although no correction officer was assigned to those units as frequently as Parker. (*Id.* ¶ 12).

Sergeant Firester changed Browne's post from Housing Unit 113 to Housing Unit 118-2 on February 25, 2020. (*Id.* ¶ 26). Browne was working as a resource officer at the time. (Browne Dep. Tr. at 78:25-79:2, 167:4-6).[2] Resource officers are assigned as directed to the posts that need

[2] Parker was also working as a resource officer during 2019 and 2020. (Parker Dep. Tr. at 25:9-24). After working as a resource officer for four years, she obtained sufficient seniority to request a specific post. (*Id.* at 26:7-27:7). Parker specifically requested, and received, the gym post. (*Id.*).

coverage. (Firester Decl. ¶ 5). When the officers assigned to specific posts are absent or if there are new temporary posts that need to be filled, resource officers are assigned to those posts. (*Id.*). Browne initially refused to comply with Firester's order to leave his office and go to the assigned post and Firester issued Browne a formal counseling. (56.1 Stmt. ¶ 28). Browne claims that Firester yelled at him during the February 25, 2020 exchange. (Browne Dep. Tr. at 158:25-162:16). The formal counseling form issued by Firester to Browne states that after Firester told Browne his assigned post, Browne "continued to be argumentative, demanding to be placed in the particular job already discussed." (Sussman Decl., Ex. 30). The formal counseling that Firester issued was later dismissed by Superintendent Barometre. (56.1 Stmt. ¶ 28). Browne did not receive any further discipline following the February 25, 2020 formal counseling. (*Id.* ¶ 29).

II. Complaints of Harassment by Other Correction Officers

On January 16, 2020, Correction Officer Lassiter—an African American woman—wrote a memorandum to Lieutenant Smith complaining of harassment in the workplace. (56.1 Stmt. ¶ 8; Sussman Decl., Ex. 55). Lassiter described an incident that took place on January 16, 2020 when she was assigned to work a shift with Correction Officer Watch, who told Lassiter that he did not want to work with her. (*Id.*). On February 14, 2020, Correction Officer Tacoronte—a Hispanic man—wrote a memorandum to D.S.S. Noeth complaining of harassment in the workplace. (Sussman Decl., Ex. 62). Tacoronte complained that Correction Officers Rios and Degarger "started spreading rumors that [he] was giving rides to inmates without bus passes." (*Id.*). On June 4, 2020, Sergeant Smallwood reported to D.S.S. Noeth that he overheard a discussion amongst a group of correction officers regarding news coverage of "the riots that were going on in the country" during which some unidentified correction officers referred to the rioters as "monkeys." (Sussman Decl., Ex. 57).

III.   Plaintiffs' Complaints and DOCCS Response

During the relevant period, DOCCS maintained policies to prevent harassment and discrimination of its employees on the basis of race and maintained a policy to report and investigate allegations of harassment and discrimination. (56.1 Stmt. ¶ 36). Parker and Browne sent Otisville Superintendent Barometre written complaints—in October and November of 2019—regarding harassment from co-workers. (Barometre Decl. ¶ 8). Superintendent Barometre ordered Captain Frawley to conduct an investigation of Plaintiffs' complaints of harassment upon receipt of the complaints. (56.1 Stmt. ¶ 39). Captain Frawley interviewed Correction Officers Milyko, Reed, Watch, and Sergeant LaForge as a part of his investigation, all of whom denied participating in or witnessing the conduct reported by Plaintiffs. (*Id.* ¶ 40). The DOCCS Office of Special Investigations ("OSI") independently conducted an investigation into Plaintiffs' complaints of harassment. (*Id.* ¶ 46). Investigator Germano, who was assigned to the case, investigated the complaints by interviewing eyewitnesses and officers accused of participating in the harassing acts. (*Id.* ¶¶ 46, 52). Germano also reviewed several To/From memoranda concerning the complaints and compared the handwriting of another correction officer to the "rat" handwriting on Parker's timecard slot. (*Id.* ¶ 53). The OSI concluded, after the completion of Germano's investigation, that Plaintiffs' complaints of harassment were unsubstantiated. (*Id.* ¶ 54). Parker also submitted complaints directly to the Governor's Office of Employee Relations ("GOER"). (*Id.* ¶ 44). The GOER stated that they did not have jurisdiction to investigate the complaints because the conduct at issue "did not appear to involve harassment or discrimination on the basis of race." (*Id.* ¶ 45).

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, No. 17-CV-3875, 2020 WL 917294, at *4 (S.D.N.Y. Feb. 26, 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).[3] "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-5486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). "The question at summary judgment is whether a genuine dispute as to a *material* fact exists—not whether the parties have a dispute as to any fact." *Hernandez v. Comm'r of Baseball*, No. 22-343, 2023 WL 5217876, at *5 (2d Cir. Aug. 15, 2023); *McKinney v. City of Middletown*, 49 F.4th 730, 737 (2d Cir. 2022)).

The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence. *Porter v. Dartmouth-Hitchcock Medical Center*, 92 F.4th 129, 147 (2d Cir. 2024) ("[T]he court may not make credibility determinations or weigh the evidence." (quoting *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010))). The task is material issue spotting, not material issue determining. Therefore, "where there is an

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial." *Bellotto v. Cnty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)).

"It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)). The Court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)). Further, "while the court is required to review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Porter*, 2024 WL 439465, at *14 (quoting *Kaytor*, 609 F.3d at 545). "In determining whether genuine issues of fact exist, the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence." *Moll v. v. Telesector Res. Grp., Inc.*, No. 20-3599, 2024 WL 820179, at *4 (2d Cir. Feb. 28, 2024) (citing *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 10 2019)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 2020 WL 917294, at * 4 (quoting *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts." *Id.* (quoting *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, if "there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)). "In sum, 'summary judgment is proper only when, with all permissible

inferences and credibility questions resolved in favor of the party against whom judgment is sought, there can be but one reasonable conclusion as to the verdict.'"

Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law. *See Glover v. Austin*, 289 F. App'x 430, 431 (2d Cir. 2008) ("Summary judgment is appropriate if, but only if, there are no genuine issues of material fact supporting an essential element of the plaintiffs' claim for relief."); *Pimentel v. City of New York*, 74 F. App'x 146, 148 (2d Cir. 2003) (holding that because plaintiff "failed to raise an issue of material fact with respect to an essential element of her[ ] claim, the District Court properly granted summary judgment dismissing that claim"). Simply put, the movant must separately establish that the law favors the judgment sought.

## ANALYSIS

Title VII bars employers from discriminating based on sex in the terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a)(1). "A hostile work environment claim requires a showing [1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). The Second Circuit has instructed courts, on summary judgment, to "examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Rivera v. Rochester Genesee Regional Transp. Authority*, 743 F.3d 11, 20 (2d Cir. 2014). "Of course, it is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable under

Title VII only when it occurs because of an employee's protected characteristic, such as race or national origin." *Rivera*, 743 F.3d at 20.

I. Imputing Liability on DOCCS

Plaintiffs' employer, DOCCS, is the only defendant in this action. Plaintiffs allege that the racially hostile work environment at Otisville was the result of the conduct of both their supervisors and co-workers. The Supreme Court held in *Vance v. Ball State Univ.* that "[u]nder Title VII, an employer's liability for such harassment may depend on the status of the harasser." 570 U.S. 421, 424 (2013). The Supreme Court articulated the following distinction between a Title VII hostile work environment claim where the harassing employee is the victim's co-worker versus the victim's supervisor.

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a 'supervisor,' however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

*Id.* The Supreme Court held that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.* "Tangible employment actions" constitute conduct that results in "a significant change in employment status such as hiring, firing, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 431.

Courts in this Circuit have held that sergeants and lieutenants working in DOCCS facilities can be considered supervisors for purposes of vicarious liability under Title VII. *See Rock v. Blaine*, No. 14-CV-01421, 2018 WL 1415202, at *10 (N.D.N.Y. Mar. 20, 2018); *Cole v. New York*

*State Dep't of Corr.*, No. 15-CV-00876, 2017 WL 1194233, at *12 (N.D.N.Y. Mar. 30, 2017). The only harassing conduct by a supervisor for which Plaintiffs offer evidence is Sergeant Firester yelling at Browne on February 25, 2020 and issuing him a formal counseling, which was later dismissed by Superintendent Barometre. (56.1 Stmt. ¶¶ 28-29). None of the other harassing conduct complained of by Plaintiffs—besides the February 25, 2020 interaction between Firester and Browne—involved a supervisor. The formal counseling issued by Firester is not the type of conduct under which DOCCS can be held strictly liable because it did not result in a "significant change in [Browne's] employment status" especially considering that the formal counseling was subsequently dismissed. *Vance*, 570 U.S. at 431.

Given that Plaintiffs have failed to establish that a supervisor engaged in harassment that culminated in a tangible employment action against Plaintiffs, DOCCS can only be liable "if it was negligent in controlling working conditions." *Id.* at 424. The record here shows that Superintendent Barometre promptly responded to Plaintiffs' complaints by ordering Captain Frawley to conduct an investigation and by forwarding Plaintiffs' complaints of harassment to the GOER and OSI. (56.1 Stmt. ¶¶ 38-39). Captain Frawley conducted an investigation that included the interviews of Correction Officers Milyko, Reed, Watch, and Sergeant LaForge, all of whom denied witnessing the acts reported by Plaintiffs. (*Id.* ¶ 40). The OSI conducted an independent investigation which similarly concluded that there was no evidence or witnesses to corroborate Plaintiffs' complaints. (*Id.* ¶ 55). The GOER concluded that Plaintiffs' complaints did not appear to involve harassment or discrimination on the basis of race. (*Id.* ¶ 45). The GOER repeatedly attempted to contact Parker, but were unsuccessful in doing so. (Barometre Decl. ¶ 18, Ex. E). Parker did not provide sufficient information for the GOER to conduct an investigation into the harassing conduct she complained of. (*Id.*).

Plaintiffs generally argue that "DOCCS conducted no meaningful investigation of [P]laintiffs' complaint of discrimination." (Def. Br. at 23-27). Plaintiffs more specifically argue that the DOCCS investigation could not have been thorough because the investigators "never interviewed Browne." (Def. Br. at 27). Plaintiffs fail to address, in making this argument, Captain Frawley's investigation of the alleged harassment. Frawley described his investigation and conclusions in a memorandum to Superintendent Barometre dated October 25, 2019. (Barometre Decl., Ex. C). Frawley states in this memorandum that he interviewed Browne on October 17, 2019, along with his interview of Milyko, Reed, Watch, and LaForge. (*Id.*). Browne states in his declaration, with respect to the OSI investigation, that he spoke with Germano for "15-20 minutes" during which he explained to Germano "how upset [he] was after Sgt. Firester screamed at me." (Browne Decl. ¶ 17). Frawley, in addition to interviewing Browne and other correction officers, received and reviewed memoranda from Correction Officers Tacorante, Gumbs, and Famularo regarding the allegations of harassment made by Plaintiffs. (Barometre Decl., Ex. C). Plaintiffs argue that the investigations conducted by DOCCS and the OSI were deficient because the investigators could have done more. That is not the standard that Defendant must satisfy. Rather, Defendant must establish that it "took substantial steps to see that [Plaintiffs'] complaint was taken seriously." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 716 (2d Cir. 1996). The internal investigation by DOCCS and the independent investigation by the OSI—which included interviews of more than five correction officers as well as the review of written memoranda from least three additional correction officers—are plainly the "substantial steps" that were needed to be taken to see that Plaintiffs' complaints were address. *Id.*

The record further shows that DOCCS took action to address workplace bullying by issuing a memorandum titled "Conduct Within the Workplace," on October 18, 2019, which was read out

loud at the beginning of the lineups all correction officers are required to attend before each shift for several days. (*Id.* ¶ 35). At the lineups during this time period, staff supervisors specifically ordered the correction officers to cease any harassment, tampering of timecards, and posting of poems, and announced that such acts would not be tolerated. (*Id.*). DOCCS also changed the procedures regarding the timecards so that correction officers were instructed to stamp their timecards and bring them back to the sergeant's office, which solved Plaintiffs' problem of their timecards going missing. (*Id.* ¶ 6). The Court concludes, after considering the totality of the circumstances, that Defendant has met its burden in establishing that it was not negligent in controlling working conditions. *See Rios v. Buffalo & Fort Erie Pub. Bridge Auth.*, 326 F. App'x 612, 614 (2d Cir. 2009) (holding that an employer's response was a "reasonable remedial measure" where the response included an investigation seeking to identify the perpetrator, issuance of a "cautionary memorandum to all employees", and the maintenance of "anti-harassment policies" during the relevant period); *LaFontant v. Mid-Hudson Forensic Psychiatric Ctr.*, No. 18-CV-00023, 2023 WL 6610764, at *14 (S.D.N.Y. Oct. 10, 2023) ("because Defendants took swift remedial action upon becoming aware of the alleged misconduct, Plaintiff fails to show that the alleged misconduct by her co-workers should be imputed to her employer").

Accordingly, liability for Plaintiffs' claim of hostile work environment in violation of Title VII may not be imputed to DOCCS as a matter of law and Defendant's motion for summary judgment is GRANTED.

II. Severe or Pervasive Harassment

Even if DOCCS could be imputed with liability under Title VII, Plaintiffs' claim separately fails because they have failed to establish that the harassment was sufficiently severe or pervasive. To establish a hostile work environment under Title VII, "a plaintiff must show that the workplace

is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320-21 (2d Cir. 2015). Plaintiffs fail to meet this standard. Plaintiffs were subjected to comments about them being "rats" or "scumbags", their timecards going missing, and prank calls over a two-year period. The fact that Plaintiffs learned of many of the comments at issue secondhand undercuts their claim because "secondhand comments are not as impactful as on one's environment as are direct statements; consequently, they are less persuasive in stating a hostile work environment claim." *LaFontant*, 2023 WL 6610764, at *13 (collecting cases).

It is undisputed that Plaintiffs' timecards stopped going missing after DOCCS instituted a policy of placing those timecards in the sergeant's office. (56.1 Stmt. ¶ 6). Plaintiffs have failed to adduce any evidence that they were unable to carry out any of their duties as a result of the conduct at issue, or that their performance was affected in any way. The record is clear that Plaintiffs were subject to mean-spirited gossip and bullying in the form of prank calls and someone hiding their timecards. Plaintiffs have failed to meet their burden in showing that this conduct, while distasteful, altered the conditions of their employment. "Title VII is not a general civility code but rather forbids only behavior so objectively offensive as to alter the conditions of the victim's employment." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020). Plaintiffs' disputes regarding not receiving their preferred shift is likewise not severe or pervasive but rather is an "ordinary tribulation of the workplace" that does not rise to the level of a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also Montanez v. McDean LLC*, 770 F. App'x 592, 594 (2d Cir. 2019) (no hostile work environment where restaurant manager made sexual jokes and comments, screamed at plaintiff in front of customers,

and assigned plaintiff disfavored responsibilities); *Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, 767 F. App'x 123, 128 (2d Cir. 2019) (a supervisor being "rude and hostile" to plaintiff on several occasions did not rise to the level of a hostile work environment and reflected only a "fraught relationship" between plaintiff and her supervisors).

Plaintiffs failed to describe an objectively hostile workplace; rather, at most, they have "described a collection of vignettes that [they] found objectionable." *Reyes v. Westchester Cnty. Health Care Corp.*, No. 19-CV-08916, 2021 WL 310945, at *10 (S.D.N.Y. Jan. 29, 2021). The record here stands in stark contrast with *Moll*, where the Second Circuit held that summary judgment was inappropriate on a Title VII hostile work environment claim where plaintiff proffered evidence "that overtly sexual or sexist comments, sexual innuendos, and gender-based disparagements were regularly directed at women" and "some managers participated in such conduct" and despite the plaintiff's complaint, the employer "did nothing in response." 2024 WL 820179. Plaintiffs were not subjected to any overtly racial or racist comments either by co-workers or by their supervisors. When Plaintiffs complained of the conduct, DOCCS promptly initiated an internal investigation and referred the complaints to the OSI, who initiated their own independent investigation. DOCCS took reasonable remedial measures in response to Plaintiffs' complaints—Plaintiffs' timecards stopped going missing after they were placed in the sergeant's room, and Plaintiffs were not called "rat" after Superintendent Barometre's memorandum to the staff—which effectively curtailed some of the conduct at issue. Plaintiffs have failed to establish that they were subjected to a harassment that was sufficiently severe or pervasive such that it altered the conditions of their employment.

III. <u>Link Between Harassment and Membership in a Protected Class</u>

"Mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable under Title VII only when it occurs because of an employee's protected

characteristic." *Harge v. City of New York*, No. 21-2293, 2022 WL 17481819, at *2 (2d Cir. Dec. 7, 2022). Plaintiffs plainly fail to show how any of the conduct of which they complain occurred because of their membership in a protected class. The conduct Plaintiffs complain of—timecards being misplaced, co-workers gossiping, the word "rat" being written one time on a timecard slot, poems that do not reference either Plaintiff being posted in a common area, and disputes about shift assignments—"amount to, at most, workplace bullying completely detached from any discriminatory motive." *Vito v. Bausch & Lomb Inc.*, 403 F. App'x 593, 596 (2d Cir. 2010). Plaintiffs fail to point to any facts beyond the conclusory and speculative assertions in their declarations that the hostility arose because of their race.

As Judge Seibel concluded in *Sherman v. Yonkers Pub. Sch.*, "[a]llegations of unfair treatment directed at a member of a protected class do not establish a claim absent a basis to conclude that unfair treatment arose because of the victim's membership in that class." No. 21-CV-07317, 2023 WL 137775, at *11 (S.D.N.Y. Jan. 9, 2023); *see also Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his race."); *Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-08812, 2015 WL 1499618, at *42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class"); *Rissman v. Chertoff*, No. 08-CV-07352, 2008 WL 5191394, at *4 (S.D.N.Y. Dec. 12, 2008) ("In essence, plaintiff alleges that because he was yelled at [by his supervisors], this must have been because [of his protected status]. Such conclusory and speculative statements are insufficient."). The episodic, isolated, and unpleasant exchanges Plaintiffs had with their co-

workers, cannot be the basis of a hostile work environment claim because there is no evidence of a link between the alleged hostile conduct and Plaintiffs' membership in a protected class. None of the comments directed at Plaintiffs invoked their race in any way. The record is clear that the bullying Plaintiffs experienced from co-workers—such as the word "rat" being written on Parker's timecard slot one time, prank calls to Browne calling him a "rat", and Plaintiffs' timecards going missing—occurred because Plaintiffs were perceived as "snitches" who might report their co-workers to supervisors or otherwise side against correction officers. The record is also clear that other correction officers besides Plaintiffs were assigned to the COVID-19 quarantine housing units multiple times. (56.1 Stmt. ¶ 12). Plaintiffs' mere speculation that staffing decisions were made in a racially discriminatory manner, without more, does not create a genuine dispute of material fact. Moreover, it is undisputed that Plaintiffs were awarded their preferred posts after being promoted from resource officers. Plaintiffs have failed to adduce any evidence beyond the four corners of their own minds that the conduct at issue occurred because of Plaintiff's race.

Plaintiffs also argue that the hostile work environment was race-based because Plaintiffs "were aware of other disparate treatment and outright discrimination against other minority officers." (Pl. Br. at 19). Plaintiffs specifically cite to (i) Smallwood's complaint that he overheard unidentified correction officers referring to rioters in the news as "monkeys" (Sussman Decl., Ex. 57); (ii) Lassiter's complaint that Watch did not want to work with him (*id.*, Ex. 55); (iii) Tacorante's complaint other officers were spreading rumors that he was giving bus rides to inmates without bus passes (*id.*, Ex. 62); and (iv) Noble's complaint regarding the removal of her timecard from its slot and that she was not allowed to swap shifts with Browne (*id.*, Ex. 56). Defendants argue that the statements made by Smallwood, Lassiter, and Tacorante "are inadmissible hearsay that cannot be considered on the instant summary judgment motion." (Reply at 4-5 (citing *Leeber*

*Realty LLC v. Trustco Bank*, 316 F. Supp. 3d 594, 600-01 (S.D.N.Y. 2018), *aff'd*, 798 Fed. Appx. 682 (2d Cir. 2019)). That is absolutely true and a separate reason to exclude the evidence. Separately, Defendant argues that the "me too" evidence is not relevant and as such is likewise inadmissible at the summary judgment stage. (Reply at 5-6). The Supreme Court held in *Sprint/United Mgmt. Co. v. Mendelsohn*, that "evidence of discrimination by other supervisors is neither *per* se admissible nor *per se* inadmissible." 552 U.S. 379, 388 (2008). Courts have identified a number of factors that "should be considered when determining the admissibility of such "me too" evidence:

> 1) Whether the evidence is logically or reasonably tied to the decision made with respect to the plaintiff; 2) Whether the same 'bad actors' were involved in the 'other' conduct and in the challenged conduct; 3) Whether the other acts and the challenged conduct were in close temporal and geographic proximity; 4) Whether decision makers within the organization knew of the decisions of others; 5) Whether the other affected employees and the plaintiff were similarly situated; and 6) The nature of the employees' allegations.

*Dotson v. City of Syracuse*, No. 11-CV-00620, 2019 WL 6337326, at *3-4 (N.D.N.Y. Nov. 27, 2019) (citing *Schneider v. Regency Heights of Windham, LLC*, No. 14-CV-00217, 2016 WL 7256675, at *12 (D. Conn. Dec. 15, 2016)). With respect to the first factor, only Noble's complaints regarding her timecards and her requests to swap shifts with Browne are "logically or reasonably tied" to Plaintiffs. *Id.* The complaints made by Smallwood, Lassiter, and Tacorante have no logical connection to the harassment directed at Plaintiffs. With respect to the second factor, only Lassiter specifically identifies a "bad actor" involved—Correction Officer Watch—in his complaint. Plaintiffs do not adduce any evidence that Watch participated in any of the harassing conduct directed at them, and so this factor cuts against admissibility. With respect to the third factor, the conduct complained of by Smallwood, Lassiter, Tacorante, and Noble occurred during the same two-year period at issue in this litigation and at Otisville, so this factor cuts in favor of

admissibility. With respect to the fourth factor, the complaints were all memorialized in To/From memoranda to supervisors at Otisville, so this factor too cuts in favor of admissibility. With respect to the fifth factor, Plaintiffs have not established that these other correction officers are similarly situated to them, either through rank, seniority, or some other metric, so this factor cuts against admissibility. With respect to the sixth factor, none of the complaints involve any racially discriminatory comments directed at Smallwood, Lassiter, Tacorante, or Noble. The only comment that comes close was made by some unidentified correction officers—and overheard by Smallwood—referring to rioters in the news as "monkeys." (Sussman Decl., Ex. 57). This was not directed at Smallwood or any other correction officer and therefore the sixth factor cuts against admissibility.[4] Finally, the totality of the comments proffered as "me too" evidence are made by correction officers, and not supervisors. This additional fact makes the "me too" evidence all the more irrelevant. The Court concludes, after considering the factors enumerated in *Dotson*, that the "me too" evidence is not closely related "to [Plaintiffs'] circumstances and theory of the case" and therefore is not admissible. 2019 WL 6337326, at *3-4.

Plaintiffs' failure to produce any evidence of a causal connection between their race and the harassing conduct at issue here constitutes "a failure of proof and is insufficient to create a genuine dispute of material fact." Under these circumstances, Defendants are entitled to summary judgment on Plaintiffs' Title VII hostile work environment claim.

---

[4] Even if the comment Smallwood overheard was admissible, "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Miller v. New York State Police*, No. 20-3976, 2022 WL 1133010, at *2 (2d Cir. Apr. 18, 2022). Once instance of a racist comment overheard by Smallwood would not therefore transform the work environment into a hostile or abusive one.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to terminate the motion sequence pending at Doc. 60 and close this case.

**SO ORDERED:**

Dated: White Plains, New York
March 1, 2024

PHILIP M. HALPERN
United States District Judge